**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | |
|---|---|
| IN RE<br><br>**GILBERT, BARBEE, MOORE & MCILVOY, P.S.C.,**<br>**d/b/a GRAVES-GILBERT CLINIC,**<br><br>Debtor and Debtor in Possession. | Chapter 11<br><br>Case No. 22-10763-JAL |

## ORDER CONFIRMING CHAPTER 11 PLAN

Pursuant to the Court's October 24, 2023 *Order Approving First Amended Disclosure Statement* (Dkt. No. 342) and October 19, 2023 *Order for Evidentiary Hearing* (Dkt. No. 323), the parties tried to the Court the issues of confirmation of Debtor's *First Amended Plan of Reorganization* (Dkt. No. 336) and dismissal for the grounds raised in the Duffs' *Motion to Dismiss* (Dkt. No. 310). The Court, having considered the parties' evidence and arguments, the findings of fact and conclusions of law in its opinion issued in conjunction with this Order, and the Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED as follows:

1. The Plan, which consists of the Plan and modifications set forth in this Confirmation Order or on the record at the Confirmation Hearing, is **CONFIRMED** in its entirety pursuant to §§ 1129 and 1141. The terms of the Plan are incorporated by reference into this Confirmation Order. The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety. Each provision of the Plan shall be deemed authorized and

approved by this Confirmation Order and shall have the same binding effect of every other provision of the Plan, whether or not mentioned in this Confirmation Order. If any inconsistencies occur between the Plan and this Confirmation Order, this Confirmation Order shall govern. Furthermore, on the Effective Date, the stay contemplated by Rule 3020(e) shall be vacated.

2.     Any objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are **OVERRULED** on the merits.

3.     The modifications to and amendments in the Plan made by this Confirmation Order are hereby **APPROVED**. Such modifications do not materially and adversely affect the treatment of any creditor who has not accepted such modifications. Accordingly, such modifications do not require additional disclosure under § 1127(c) or Rule 3019. Disclosure of the technical modifications requested in Debtor's Confirmation Memorandum and on the record at the December Trial constitutes due and sufficient notice thereof under the circumstances of this case.

4.     Notwithstanding any otherwise applicable law but subject to the occurrence of the Effective Date, the terms of the Plan (including all documents and agreements executed pursuant to the Plan) and this Confirmation Order shall **BIND** (a) Debtor; (b) all holders of claims against and interest in Debtor, whether or not impaired under the Plan, and whether or not, if impaired, such holder accepted the Plan; (c) any other party in interest, including those identified in § 1141; (d) any entity making an appearance in this case; and (e) each of the foregoing's respective heirs, successors,

assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

5.     All claims and interests shall be classified and treated as set forth in the Plan.  The Plan's classification scheme and treatment of Claims and Interests is approved. Notwithstanding § 1141(d)(1)(B), Debtor's owners may **RETAIN** their equity interests pursuant to the New Value Corollary to the Absolute Priority Rule that Congress codified in § 1129(b).  The owners' retention of these interests shall not (a) limit their right to alienate or exchange such interest under applicable nonbankruptcy law or (b) otherwise restrict their right to hold interests in the reorganized debtor as contemplated by § 8.2 of the Plan.

6.     Pursuant to §§ 1141 and 1142 and the provisions of this Confirmation Order, the Plan and all Plan-related documents are valid, binding, and enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The modifications are enforceable and do not constitute material modifications that might otherwise require re-solicitation.  Debtor shall be **DISCHARGED** pursuant to § 1141(d) upon the entry of this Confirmation Order.

7.     Pursuant to § 1142(b), upon entry of this Confirmation Order and subject to the occurrence of the Effective Date, Debtor is **AUTHORIZED** to take or cause to be taken all actions necessary or appropriate to implement all provisions of the Plan and to execute, enter into, or otherwise make effective all documents arising in connection therewith.  This right shall extend to any amendments to Debtor's governing documents, whether amended in furtherance of Debtor's rehabilitation or in connection with the

corporate restructuring contemplated in § 8.2, that Debtor's board of directors adopts pursuant to a majority vote of that board during a session called for the purpose of making such amendments within twelve months of this Confirmation Order's entry. All such actions taken or caused to be taken are authorized and approved by the Court such that no further approval, act, or action need to be taken under any applicable law, order, rule, or regulation. Any failure herein to authorize any specific act shall not be construed to proscribe such act.

8.      Pursuant to the terms and provisions of the Plan, Debtor shall make the **DISTRIBUTIONS** specified under the Plan at the times specified therein. Except as otherwise provided in the Plan and this Confirmation Order, all causes of action shall be retained for the benefit of Debtor and its estates as set forth in the Plan, the Disclosure Statement, and this Confirmation Order. No person or entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against it as any indication that Debtor will not pursue all available causes of action. Debtor expressly reserves, specifically and unequivocally, all rights to prosecute and enforce and all causes of action against any person or entity, unless such cause is specifically and expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan. Debtor otherwise expressly reserves all causes of action for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), standing, or laches, shall apply to such cause by reason of the entry of this Confirmation Order.

9.     The release, injunction and exculpation provisions set forth in § 12 of the Plan are **APPROVED** and shall be effective without further action upon the occurrence of the Effective Date.  Each released party shall have the right to independently seek the enforcement of such injunctions by this Court.  However, for the reasons discussed herein, such injunctions shall not operate to release or discharge any physician, whether presently or previously employed by Debtor, whose conduct was the proximate cause of any Class 4-B claimant's injury from medical malpractice that was sustained by such claimant during any medical treatment or procedure by Debtor's physicians on or before the Effective Date.

10.     Except as otherwise specifically provided by the Plan and this Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction and release, effective as of the Confirmation Date of (i) all claims and causes of action against, liabilities of, liens on, obligations of and interests in, Debtor and its assets, whether known or unknown; and (ii) all causes of action (whether known or unknown, either directly or derivatively through Debtor) against, claims against, liabilities (as guarantor or otherwise) of, and obligations of successors and assigns of, Debtor based on the same subject matter as any claim or interest existing prior to the Effective Date that was or could have been the subject of any claim or interest, regardless of whether or proof of such claim or interest was (A) filed, (B) allowed, or (C) voted on the Plan.

11.     Except as otherwise expressly provided in the Plan and this Confirmation Order, for the consideration described in the Plan, all entities (including persons acting

on their behalf) who have held or hold any claim discharged or released under the Plan, whether known or unknown, are hereby permanently enjoined as of the Effective Date, from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any claim against any released party or their property; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any released party or their property; (iii) creating, perfecting, or enforcing any encumbrance of any kind against any released party or their property; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to any released party; and (v) taking any act that does not conform to or comply with provisions of the Plan or this Confirmation Order.  If an action that is prohibited by or is otherwise inconsistent with the provisions of this Confirmation Order or the Plan is taken, then the action or proceeding in which the claim of such entity is asserted shall automatically be transferred to this Court for adjudication.

12.     Pursuant to §§ 105(a) and 1142, the Court shall retain and shall have **EXCLUSIVE JURISDICTION** over any matter: (a) arising under the Bankruptcy Code; (b) arising in or related to this cases or the Plan; (c) that relates to the enforcement of the Plan's provisions, including without limitation any determinations of whether or not any claim or interest has been affected by the Plan or this Confirmation Order; and (d) for such other purposes as may be necessary or useful to aid in the enforcement or implementation of the Plan or this Confirmation Order.

13.     The claim of the Internal Revenue Service, to the extent unpaid, shall bear interest at the § 511 rate. (*See* Confirmation Memorandum at pp. 29-30.)

14.    Pursuant to § 1129(a)(13), Debtor shall continue to provide its employees the benefits provided under the various life and disability insurance plans administered by Symetra during the pre-confirmation period of this case, (*see* Confirmation Memorandum at pp. 35-36), for the duration of the period Debtor has obligated itself to provide such benefits.

15.    The Clerk's Office shall serve a copy of this Confirmation Order in accordance with applicable Bankruptcy Rules on all creditors, the United States Trustee, and entities that requested notice in this case.  Upon the occurrence of the Effective Date, Debtor shall promptly file a notice of the occurrence of the Effective Date, which the Clerk's Office shall serve upon all creditors, the United States Trustee, and entities that requested notice in this case in accordance with applicable Bankruptcy Rules.

16.    Substantial Consummation of the Plan shall be deemed to occur on the Effective Date.  Debtor may seek the entry of a final decree at any time after the Effective Date.[1]

17.    The Duffs' Motion to Dismiss Debtor's bankruptcy case as a bad-faith filing (Dkt. No. 310) is **MOOT**. *E.g.*, *In re Marquez*, No. 10-03882, 2011 WL 4543226, at *10 (Bankr. D.P.R. Sept. 28, 2011).

---

[1] *E.g.*, *In re AOG Entm't*, 569 B.R. 563, 585 (Bankr. S.D.N.Y. 2017) (observing that keeping a case open longer than necessary could have significant financial consequences for the reorganized debtor because it must continue to pay the U.S. Trustee's fees).

Tendered by:

/s/ Brian R. Pollock
Brian R. Pollock (bpollock@stites.com)
John Tate (jtate@stites.com)
Alisa Micu (amicu@stites.com)
Brandon Lira (blira@stites.com)
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone:  (502) 587-3400

Charity S. Bird (cbird@kaplanjohnsonlaw.com)
Tyler R. Yeager (tyeager@kaplanjohnsonlaw.com)
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY  40202
Telephone:  (502) 416-1630

*Counsel for Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

IN RE

**GILBERT, BARBEE, MOORE & MCILVOY, P.S.C.,**
**d/b/a GRAVES-GILBERT CLINIC,**

Debtor and Debtor in Possession.

Chapter 11

Case No. 22-10763-JAL

---

### DEBTOR'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Pursuant to the Court's October 24, 2023 *Order Approving First Amended Disclosure Statement* (Dkt. No. 342) and October 19, 2023 *Order for Evidentiary Hearing* (Dkt. No. 323), the parties tried to the Court the issues of confirmation of Debtor's *First Amended Plan of Reorganization* (Dkt. No. 336) and dismissal for the grounds raised in the Duffs' *Motion to Dismiss* (Dkt. No. 310). Now, having considered the parties' evidence and arguments, the Court makes the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52 (as made applicable by FED. R. BANKR. P. 7052 and 9014(c)). The Court will confirm Debtor's Plan and deny the Duffs' Motion.[1]

### JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have

---

[1] Though confirmation of the Plan renders the Motion to Dismiss moot, the Court adopts its findings of fact and conclusions of law as they may pertain to the issues raised in the Duffs' Motion. As evident from the multiple parties which objected to confirmation, this is not a two-party dispute. The implications of posting a supersedeas bond on Debtor — a belabored issue raised by the Duffs which the Court does not view as a factor in analyzing whether this case was filed in bad faith — demonstrate that Debtor had significant business justification for seeking protection in bankruptcy. For the reasons the Court will confirm the Plan, and the arguments raised by Debtor in opposition to dismissal, the Court would deny the Motion to Dismiss even if not moot.

"original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b).  District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a).  In accordance with § 157(a), the District Court for the Western District of Kentucky has adopted Local Rule 83.12, which refers all of its bankruptcy cases to this Court.

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1).  Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3).  As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c); *In re Radco Merch. Servs., Inc.*, 111 B.R. 684, 686 (N.D. Ill. 1990).  Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

A confirmation contest arises only as a result of a case under the Bankruptcy Code and is statutorily specified as a core proceeding. 28 U.S.C. § 157(b)(2)(L).  Likewise dismissal under § 1112(b) can arise only as a result of a Chapter 11 bankruptcy case and

is a matter concerning the administration of the estate. 28 U.S.C. § 157(b)(2)(A). Additionally, as each of these matters "stems from the bankruptcy itself," the Court possesses Constitutional authority to resolve them. *Stern v. Marshall*, 564 U.S. 462, 499 (2011). Furthermore, no one has challenged this Court's jurisdiction or Constitutional authority, so the parties' consent to this Court's jurisdiction is implied. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1948 (2015) ("[N]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express[.]").

## BACKGROUND AND PROCEDURAL POSTURE

On October 19, 2023, the Court approved Debtor's disclosure statement following a continued and contested hearing on the adequacy of that statement. ("Procedures Order," Dkt. No. 342.) Votes from parties in interest were solicited in accordance with Rule 3017(d) and the Procedures Order, and those votes have been tabulated in the ballot report that Debtor filed on November 27, 2023 ("Ballot Report," Dkt. No. 368), which is incorporated herein by reference.

The Ballot Report shows that six classes of creditors voted on the Plan. Four of these six classes accepted the Plan. (Ballot Report ¶¶ 14-17.) Each such class is deemed an accepting class because the creditors holding at least two-thirds in amount and more than one-half in number of the claims that were actually voted accepted the Plan. *See* 11 U.S.C. § 1126(c). One class of tort claimants accepted the Plan, and the other two classes of tort claimants—Classes 4-B and 4-C—rejected it. (Ballot Report ¶ 12.)

3

*Creditor Objections*

Creditors were also given the opportunity to file objections to the Plan. Several tort claimants, all from either Class 4-B or Class 4-C, filed objections. The first objection was filed by Justin and Brianna Cole on behalf of themselves and their minor child. ("Cole Objection," Dkt. No. 366.) Alice and Dean Lloyd Duff demurred next. ("Duff Objection," Dkt. No. 369.) Then Gary and Marketta Dubree objected. ("Dubree Objection," Dkt. No. 370.) Billy and Patricia Tweedy thereafter filed a joint objection with Jerri Lynn McAdoo on behalf of her minor child. ("Tweedy Objection," Dkt. No. 371.) Lucas Jenkins also objected. ("Jenkins Objection," Dkt. No. 372.) And so did David and Carolyn Coldwell. ("Coldwell Objection," Dkt. No. 373.) These objections substantially overlap with each other and are largely legal in nature, rather than factual. The following objections have been asserted by creditors:[2]

| STATUTE(S) | ISSUE(S) | ASSERTING CREDITOR(S) |
|---|---|---|
| §§ 524(e) & 1123(b)(6) | Non-Debtor Releases | Cole Objection at pp. 4-5; Dubree Objection at pp. 1-4; Tweedy Objection ¶¶ H-I; Jenkins Objection at pp. 4-5; and Coldwell Objection at pp. 4-5. |
| § 1129(a)(3) | Artificial Impairment; Reversion of Class 4-C Fund | Cole Objection at pp. 2-5; Duff Objection at pp. 10-12 & 13-15; Tweedy Objection ¶ K; Jenkins Objection at pp. 2-5; and Coldwell Objection at pp. 2-5. |

[2] To the extent that some tort claimants merely join the substantive objections of other creditors in whole or in part, (*see*, *e.g.*, Dubree Objection at pp. 4-5), this summary chart and memorandum do not undertake to acknowledge and address such challenges multiple times.

| STATUTE(S) | ISSUE(S) | ASSERTING CREDITOR(S) |
|---|---|---|
| § 1129(a)(7) | Liquidation Test | Cole Objection at pp. 5-6; Duff Objection at pp. 9-10; Tweedy Objection ¶ J; Jenkins Objection at pp. 5-6; and Coldwell Objection at pp. 5-6. |
| § 1129(a)(11) | Feasibility | Duff Objection at pp. 12-13. |
| § 1129(b)(1) | Absolute Priority Rule | Cole Objection at pp. 6-7; Duff Objection at pp. 7-9; Tweedy Objection ¶¶ E-G; Jenkins Objection at pp. 6-7; and Coldwell Objection at pp. 6-7. |

*Relevant Filings*

In considering the Duffs' Motion and this confirmation contest, the Court has considered its prior rulings in this matter as well as the arguments of the parties at the trial that took place on December 12 through 13, 2023 (the "December Trial"). Furthermore, the Court has reviewed and considered the following documents:

1.    the *First Amended Plan of Reorganization* proposed by Debtor on October 23, 2023 (the "Plan," Dkt. No. 336);

2.    the Court's Procedures Order entered on October 23, 2023, approving Debtor's *First Amended Disclosure Statement* and setting a hearing on confirmation of the Plan (Dkt. No. 342);

3.    the *Ballot Report* Debtor filed on November 27, 2023 (Dkt. No. 368);

4.    the *Certificate of Mailing* Debtor filed on November 9, 2023, regarding service of the confirmation documents and ballots for accepting or rejecting the Plan (Dkt. No. 351);

5.    the *Objections to Debtor's Plan* filed by various creditors, as delineated above;

6.    the transcripts of the testimony heard on December 12, 2023 (Dkt. No. 448, which is hereinafter cited "Tuesday Tr. __");

7.     the transcripts of the testimony heard on December 13, 2023 (Dkt. No. 449, which is hereinafter cited "Wednesday Tr. __"); and

8.     all representations, arguments, testimony, documents, and evidence presented at the Trial.

### *Documentary Evidence*

The Court has also taken into consideration all admitted exhibits submitted in conjunction with the Plan and Motion:

1.     Debtor's Exhibits 1 through 28 (Dkt. Nos. 408, 413), which are deemed admitted for the lack of objection interposed against them pursuant to the Procedures Order, *e.g.*, *In re Anderson*, 250 B.R. 707, 708 (Bankr. D. Mont. 2000);

2.     The Duffs' Exhibits 1 through 5, 7 and 8, 10 and 11, and 16 through 19 (Dkt. Nos. 406-07), which are likewise deemed admitted for the lack of objection;

3.     The Duffs' Exhibits 12 through 14, for the reasons stated in open court;

4.     An unmarked exhibit dated April 2023 and tendered by the Duffs at the December Trial during the testimony of Steven Sinclair (Dkt. No. 444 at pp. 1-2);

5.     The Dubrees' Exhibits 5 and 6, which were tendered as evidence by the agreement of counsel (Dkt. No. 410 at p. 1);

6.     Excerpts of the trial depositions of Dr. Jerry Roy, Mr. Michael D'Eramo, and Mr. Christopher Thorn, tendered by Debtor and the Duffs pursuant to the Court's evidentiary rulings at the December Trial concerning the admissibility of these transcripts under FED. R. CIV. P. 32. (Dkt. No. 444.)

The Court otherwise sustains the well-taken objections to the parties' exhibits raised by Debtor for the reasons stated in those objections (Dkt. Nos. 409-11, 434), as well as the reasons stated by the Court during the December Trial.  This is both appropriate

on the merits and fair to the parties, because the creditors did not actually offer into evidence almost all of the contested exhibits.

### *Lay and Expert Witnesses*

Creditors called no witnesses at the December Trial, preferring instead to rely on cross-examinations of Debtor's witnesses and pre-trial depositions.[3]  However, in addition to the above-described documents and exhibits, the Court heard testimony from six witnesses called by Debtor:

1.    Steven Sinclair, Debtor's Chief Financial Officer.

2.    Christopher Vowels, Debtor's Finance Director.

3.    Trevor Miller, an Expert Real Estate Appraiser.

4.    Eric Wilensky, an Expert Auctioneer and Asset Appraiser.

5.    Jeffery Daigrepont, an Expert on Healthcare Businesses.

6.    Jeffrey Brewster, an Expert on Enterprise Valuation.

The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated).  Testimony is particularly credible when it is coherent, facially plausible, and consistent with

---

[3] The Duffs did attempt to call a putative expert on enterprise valuation at the December Trial.  However, they intended to call that witness to testify about an expert report that they commissioned and disclosed to Debtor in the middle of the December Trial.  For the reasons stated in open court, the Court rejected this attempt to conduct a trial by ambush.

documentary evidence. *In re Pearson Bros. Co.*, 787 F.2d 1157, 1162 (7th Cir. 1986). The Court had ample opportunity to observe the demeanor and attitudes of Debtor's witnesses at the December Trial. Furthermore, the Court has reviewed the exhibits, transcripts, and its own trial notes. After this careful review, the Court finds that the testimony of Debtor's witnesses was coherent, plausible, and consistent with documentary evidence, and thus, credible.

### *Expert Reports*

Debtor tendered the reports of four experts, Messrs. Miller (Debtor's Exs. 22-24), Wilensky (Debtor's Exs. 20-21), Daigrepont (Debtor's Ex. 25), and Brewster (Debtor's Ex. 26). These experts prepared written reports (which Debtor timely disclosed in accordance with the Procedures Order), and credibly testified at the December Trial as to the contents of those reports. No party in interest challenged the qualifications of these witnesses to speak to the subject matter of each report as experts in their respective fields. In addition to these reports being deemed admitted under the Procedures Order, the Court admits these reports for two reasons. First, these reports' factual bases, data, principles, methods, and applications have not been sufficiently called into question so as to raise any bona questions of those sorts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-58 (1999). Second, the Court's independent review of these reports left the indelible impression that Debtor's experts' reports utilized reasonable methodologies that render their opinions' reliable. *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) (discussing the "wide latitude" accorded the trial courts to assess the reliability of expert opinions). The experts' testimony at the December Trial strengthened these

impressions, and both their testimony and their reports have assisted the Court in understanding the issues raised in connection with the December Trial. Each expert was also cross-examined and, in some cases, cross-examined by multiple parties. These cross-examinations did not unearth any material deficiencies in the reports' or experts' methodologies.

*Miller Report*.[4]    Mr. Miller's methodology is reliably based on his professional experience. He currently serves as a Senior Director of JLL Valuation & Advisory Services, LLC (Wednesday Tr. 8:9-13) where he is the firm's Value and Risk Advisor in Columbus, Ohio. (*E.g.*, Debtor's Ex. 24 at p. 92.) He holds a bachelor's degree in Geography and Urban Planning from Miami University and a master's degree in City and Regional Planning from The Ohio State University. (Wednesday Tr. 10:7-14.) He testified at length about how his decades of experience in the real estate industry informed his analysis of the facts of this case. A significant portion of his professional time is devoted to the valuation of medical facilities. (Wednesday Tr. 11:14-18.) The fact that he is a licensed appraiser in the Commonwealth of Kentucky, as well as several other states, further enhances his credibility on these issues. (Wednesday Tr. 10:18-21.) His

---

[4] At the December Trial, the Duffs made an oral motion to exclude Mr. Miller's testimony pursuant to FED. R. CIV. P. 26(a). They argued that Mr. Miller's testimony should be excluded because they had requested all of the contents of his working file in connection with his deposition and had not received those contents before the December Trial. (Wednesday Tr. 5:21-6:11.) There were two problems with this motion. First, Civil Rule 26(a) does not apply to contested matters, such as the December Trial. *See* FED. R. BANKR. P. 9014(c). Second, the Duffs had taken his deposition on less than 24-hours' notice and four days before the December Trial commenced. (Dkt. No. 415.) It was not reasonable for the Duffs to expect for these documents to be produced—to the extent they were discoverable in the first instance (*cf.* Wednesday Tr. 43:2-12)—within the single business day remaining between the deposition and the December Trial.

report assessed the value of Debtor's real properties under both an "income approach" and a "sales comparison approach," and his explanation for not utilizing the "cost approach"—that it is only appropriate for new construction—is reasonable. (Debtor's Ex. 22 at pp. 48-49; Debtor's Ex. 23 at pp. 50-51; Debtor's Ex. 24 at pp. 36-37.) These methodologies comport with the Uniform Standards of Professional Appraisal Practice ("USPAP") (*e.g.*, Debtor's Ex. 24 at p. 1, ¶ 7), which enhances the weight of Mr. Miller's report. *See In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 65 (B.A.P. 6th Cir. 2012). Further enhancing is that weight is the fact that JLL subjects its reports to an internal form of peer review before releasing those reports to its clients. (Wednesday Tr. 14:4-20.) For these reasons, the Court finds Mr. Miller's uncontroverted opinion[5] that Debtor's real properties would be worth approximately $14,772,500.00[6] in the event of a liquidation to be credible. (Debtor's Ex. 22 at p. 79; Debtor's Ex. 23 at p. 81; Debtor's Ex. 24 at p. 70.) The Court further finds that the assumptions undergirding Mr. Miller's liquidation analyses are reasonable and appropriately tailored to the facts of this case. (Debtor's Ex.

---

[5] The Duffs did attempt to undermine Mr. Miller's conclusions by questioning him about an April 2023 appraisal report commissioned by one of Debtor's lenders. (*E.g.*, Wednesday Tr. 33:5-18.) However, Mr. Miller did not rely on this other appraisal in drawing his conclusions, *id.*, and the lender's report, being prepared for other purposes, did not reach and assess the issue germane to confirmation: the *liquidation* value of Debtor's real estate. Because the lender's report did not include the relevant measure of value and pre-dates the Plan's Effective Date by about nine months, the Court deems Mr. Miller's report and testimony uncontroverted.

[6] The Court's figure includes Mr. Miller's appraised liquidation values for Debtor's commercial properties ($14,710,000.00) and adds the PVA value of 119 Chestnut Road ($62,500.00). (*See* Debtor's Ex. 2 at p. 7.) Mr. Miller's reports omitted the Chestnut Road property because it is technically a single-family home and he has no expertise with that sort of property. (Wednesday Tr. 12:14-13:3.)

22 at p. 75; Debtor's Ex. 23 at p. 77; Debtor's Ex. 24 at p. 68; *see also* Wednesday Tr. 15:3-14.)

*Wilensky Report*.  Mr. Wilensky's methodology is reliably based on his professional experience.   In addition to founding and operating a company specializing in the refurbishment of medical equipment, Victori Group, LLC, Mr. Wilensky also serves as manager of TAB Auctions, LLC.  (Wednesday Tr. 45:18-46:7 & 46:19-47:2.)  He earned a bachelor's degree in business from Indiana University. (Wednesday Tr. 47:23-24.)  He testified at length about how his decades of experience in the healthcare industry informed his analysis of the facts of this case.  (*E.g.*, Wednesday Tr. 46:8-12 & 47:3-11.)  He holds licenses from both the American Society of Appraisals and the Certified Appraisers Guild of America, which further enhances his credibility on these issues.  (Wednesday Tr. 47:14-22.)  As does the fact that his professional time is nearly entirely devoted to the valuation of distressed medical facilities and equipment (Wednesday Tr. 48:6-17 & 51:2-9) which is a niche area in which only a "handful" of people have comparable expertise.  (Wednesday Tr. 53:12-20.)  Mr. Wilensky's associate spent a day and a half at Debtor's primary operating facilities assessing the condition of Debtor's equipment before Mr. Wilensky made his final valuations.  (Wednesday Tr. 54:13-55:5 & 56:15-22.)   In drawing those final conclusions, Mr. Wilensky adhered to USPAP, (*e.g.*, Debtor's Ex. 20 at p. 6), further enhancing the weight of his report.  *Creekside*, 477 B.R. at 65.  For these reasons, the Court finds Mr. Wilensky's uncontroverted opinion that

Debtor's tangible assets would be worth approximately $3,000,000.00[7] in the event of a liquidation to be credible. (Debtor's Ex. 20 at p. 5.)

*Daigrepont Report*.    Mr. Daigrepont's methodology is reliably based on his professional experience. He currently serves as Senior Vice President of the Coker Group in Alpharetta, Georgia, where he has been employed for 23 years. (Wednesday Tr. 74:16-24.)  His current role includes consulting work for hospitals throughout the country who need to upgrade or otherwise revamp their electronic patient records. (Wednesday Tr. 75:18-76:7.)  A large portion of his consultancy focuses on the handling of patient records for healthcare enterprises that are winding down. (Wednesday Tr. 76:8-24.)  He has authored and published seven healthcare-related books, including "a bestseller written for the American Medical Association. . . ." (Wednesday Tr. 77:11-22.)  He is also a frequent lecturer on healthcare topics, including for professional organizations in the healthcare space. (Wednesday Tr. 77:23-78:14.)   The fact that he is certified by the

---

[7] Technically, Debtor has grossed up Mr. Wilensky's orderly liquidation value from $2,135,909.00 to $3,000,000.00 in order to account for the fact that Mr. Wilensky's report only valued the assets at Debtor's three primary locations (201 Park Street; 2724 Nashville Road; and 165 Natchez Trace). (*Compare* Debtor's Ex. 20 at p. 5 *with* Debtor's Ex. 9 at pp. 56 & 58.) This gross-up was probably excessive at the time of Debtor's initial liquidation analysis because Debtor's other treatment centers—including the Natchez Trace property—are smaller, leased facilities. (*See* Debtor's Ex. 2 at pp. 100-07.)  However, the Court finds that Debtor's grossed-up figure is a reasonably certain measure of the aggregate liquidation value of Debtor's equipment across its operating facilities, *cf. Devonshire v. Johnston Grp. First Advisors*, 338 F. Supp. 2d 823, 825 (N.D. Ohio 2004) (party with burden of proof must establish with "reasonable certainty" any sum certain that must be determined in connection with the adjudication), *aff'd*, 166 F. App'x 811 (6th Cir. 2006), because the gross-up was a generous 50% and because Debtor purchased a new MRI machine for approximately $1,200,000.00 during the bankruptcy case. (Tuesday Tr. 77:2-4.)  Although the exact liquidation value of this MRI machine is not yet ascertainable because of a lack of market data for this year's equipment, (Wednesday Tr. 58:21-59:6), the Court concludes, on the evidence before it, that the MRI machine is reasonably encompassed within the gross-up.

12

American Academy of Medical Management adds further credibility to his testimony on these issues. (Wednesday Tr. 78:15-20.)  Based on the applicable legal requirements under various sources of law (Wednesday Tr. 80:14-81:4 & 85:15-25), Mr. Daigrepont determined in his report that the costs of managing and liquidating Debtor's healthcare records would total approximately $3,824,040.00, which includes a 30% volume discount based on the size of Debtor's practice. (Debtor's Ex. 25 at p. 6.)  The Court finds Mr. Daigrepont's uncontroverted opinion to be credible and accurate.  Mr. Daigrepont's assessment was challenged based on the implications of § 351 of the Code.  (Wednesday Tr. 95:3-96:10.)  The Court notes that the relief provided to a trustee from complying with applicable non-bankruptcy law only becomes applicable if there are insufficient funds.  If § 351 were applicable, it would reduce the estimated cost of handling patient records of $3,130,706.00.  The Court finds that the assumptions undergirding Mr. Daigrepont's analyses are reasonable and appropriately tailored to the facts of this case. (Debtor's Ex. 25 at pp. 5-6; Wednesday Tr. 88:8-89:21, 90:2-91:10, 97:13-98:6, & 104:11-21.) Indeed, one might argue that his methodologies were conservative in that Mr. Daigrepont's estimate did not account for all of Debtor's patient records, because Debtor's "extremely complex" IT environment comprises "over 100 systems . . . that manage what one might consider the [patients'] records. . . ." (Wednesday. 81:13 & 82:8-9.) For these reasons, Mr. Daigrepont's estimate only accounted for the patient records held in Debtor's two largest databases, which necessarily omits many patient records. (Wednesday Tr. 86:1-12.)

_Brewster Report_.  Mr. Brewster's methodology is reliably based on his professional experience.  He currently owns and operates a business consultancy, BT Valuation, Inc.

(Wednesday Tr. 112:1-11), which he founded after spending decades working as a financial analyst in various roles. (*E.g.*, Wednesday Tr. 106:23-107:23.) He holds both a bachelor's degree and a master's degree in finance (Wednesday Tr. 106:10-20), and formerly taught graduate-level courses in finance at Lewis University in the Chicago area. (Wednesday Tr. 108:9-25.) Various organizations have invited him to speak on financial matters, including enterprise valuations. (Wednesday Tr. 109:7-17.) The fact that he is a Chartered Financial Analyst—one of the highest certifications in finance—further enhances his credibility on these issues. (*See generally* Wednesday Tr. 109-18-111:21 (describing the arduous steps to becoming a CFA).) He testified at length about how his decades of experience in the financial industry informed his analysis of the facts of this case. (Wednesday Tr. 113:11-117:18.) In exercising that professional judgment, Mr. Brewster's report ultimately applied two distinct methodologies—discounted cash flows and capitalized earnings—under the "income approach" to calculate the value of Debtor's equity interests.[8] (Debtor's Ex. 26 at pp. 19-22.) These methodologies comport with the Statements of Standards for Valuation Services ("SSVS") promulgated by the American Institute of Certified Public Accountants ("AICPA") (Wednesday Tr. 113:1-7), which further enhances the weight of Mr. Brewster's report. *Cf. In re Com. Fin. Servs., Inc.*, 350 B.R. 520, 529-30 (Bankr. N.D. Okla. 2005) (concluding, in part, that an expert's certification by the AICPA rendered him a credible expert). For these reasons, the Court

---

[8] His explanations for not using the "cost" approach (*i.e.*, that it fails to account for Debtor's future prospects and terminal value) or the "market" approach (*i.e.*, the lack of comparable companies within the available industry data) were reasonable and credible. (Debtor's Ex. 26 at pp. 18-19; Wednesday Tr. 124:6-126:6.)

finds Mr. Brewster's uncontroverted opinion that Debtor's equity is worthless to be reliable and credible.[9] (Debtor's Ex. 26 at p. 24.)   The Court further finds that the assumptions undergirding Mr. Brewster's analyses are reasonable and appropriately tailored to the facts of this case. (Debtor's Ex. 26 at pp. 30-31.) Indeed, like Mr. Daigrepont, the record strongly suggests that Mr. Brewster's methodology was likely conservative. Before the Duffs' intended expert on enterprise valuation was excluded for the reasons discussed *supra*, the Duffs' witness had initially prepared a one-page report which stated Debtor's equity had a net value of *negative* $15,509,894.00. (*See* Dkt. No. 406-20.)  Although this report was also untimely for the reasons discussed in open court, it is significant to the analysis that a creditor's own expert concluded the value of Debtor's equity was worth millions less than Debtor's expert had previously concluded. In the Court's view, this significantly enhances the credibility of Mr. Brewster's conclusions.

## ANALYSIS

Confirmation of a plan of reorganization is the statutory goal of every Chapter 11 case. *See N.C.P. Mktg. Grp., Inc. v. BG Star Prods., Inc.*, 556 U.S. 1145 (2009) ("The object of Chapter 11 of the Bankruptcy Code is to empower a debtor with going concern value to reorganize its operations to become solvent once more.").  Section 1129 of the Bankruptcy Code specifies the requirements for allowing a debtor to discharge its unpaid debts and continue its operations by reorganizing through a Chapter 11 plan.  These statutory

---

[9] Technically, his conclusion was that Debtor's equity had a net value of about *negative* $7,000,000.00. (Debtor's Ex. 26 at p. 24.) However, "since in reality and logic, [we know] that nobody will pay to have their company taken over, we put a zero value on it." (Wednesday Tr. 123:13-15.)

requirements are manifold and multiform, and they differ depending on whether or not confirmation is consensual.

Section 1129(a) governs consensual confirmation. It contains sixteen paragraphs (thirteen of which apply to corporate debtors), and each such paragraph contains a separate requirement that must be met in order to confirm a debtor's plan. Among the most-litigated requirements are the good-faith test in § 1129(a)(3), the best-interest-of-creditors test in § 1129(a)(7), and the feasibility test in § 1129(a)(11).

Section 1129(b) governs nonconsensual confirmation. That provision's standards govern this confirmation hearing because Class 4-B and Class 4-C creditors have voted against confirmation of Debtor's Plan. (Ballot Report ¶ 12.) Because nonconsensual confirmation must be achieved, Debtor, as the Plan's proponent, must present evidence that the Plan satisfies the requirements of § 1129(a), *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 292 (Bankr. N.D. Ill. 2008), other than the § 1129(a)(8) requirement that all classes consent or be unimpaired. *See* 11 U.S.C. § 1129(b)(1). In addition, it must be shown that Debtor's Plan does not unfairly discriminate against any dissenting classes and that the Plan's treatment of such dissenting classes is fair and equitable. 11 U.S.C. § 1129(b)(2)(B); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988) ("It is clear from this language that a plan need only be fair and equitable to classes that voted against the plan.").

The Court considers separately the provisions which are contested from those which are not. For the reasons which follow, the Court finds that Debtor's Plan satisfies all statutory requirements, including the requirements specifically contested by the dissenting creditors.

16

1.    **UNCONTESTED STATUTORY REQUIREMENTS.**

As set forth above, various creditors have objected to Debtor's Plan only under specific provisions of the Code.  In the discussion *infra*, the Court addresses the contested requirements of the Code.  However, the Court's analysis cannot be solely confined to the contested requirements because the Court has an independent duty to assess Debtor's compliance with all confirmation standards. *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 132 (Bankr. D.N.J. 2010).

To satisfy this obligation, the Court has engaged in a searching inquiry examining Debtor's Plan, the evidence, and all requirements of §§ 1129(a) and (b).  In the absence of an objection and to preserve judicial resources, the Court elects not to engage in an extended explanation of the uncontested confirmation requirements.  However, the Court concludes Debtor met its burden with respect to each and every uncontested confirmation requirement under § 1129(a), including for the reasons stated in Debtor's *Memorandum in Support of Confirmation*. (The "Confirmation Memorandum," Dkt. No. 382.)  The Court further concludes that §§ 1129(a)(14), (15), and (16) are inapplicable to this bankruptcy case.  Notwithstanding these conclusions, the Court will revise the Plan in certain minor respects through the Confirmation Order entered concomitantly with this decision, including with respect to the uncontested and technical revisions that Debtor sought by means of the Confirmation Order.  (*E.g.*, Confirmation Memorandum at pp. 29-30.)

2.    SECTION 1129(A)(3) — PROPOSAL OF THE PLAN IN GOOD FAITH.

Section 1129(a)(3) states that a court can confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." The Duffs argue that Debtor's Plan is not confirmable under § 1129(a)(3) because Debtor "artificially impaired" its Unsecured Trade Vendors (Class 3-A), which they argue shows that Debtor proposed its Plan in bad faith. (Duff Objection at pp. 10-12 & 13-15.)[10] They cite the *district court's intermediate* decision in *Fed. Nat. Mortg. Ass'n v. Vill. Green I, GP*, 483 B.R. 807 (W.D. Tenn. 2012), in support of their argument that the treatment of Class 3-A is a contrivance meant to circumvent § 1129(a)(10)'s requirement that at least one impaired creditor class accept the Plan, because the Plan's payments to creditors whose claims sound in tort law ($3,000,000.00) is larger than the Trade Vendors' shortfall ($60,357.79). This is a false trail.

---

[10] Without citation to authority, several creditors repeat the Duffs' artificial-impairment argument. (Cole Objection at pp. 2-5; Tweedy Objection ¶ K; Jenkins Objection at pp. 2-5; and Coldwell Objection at pp. 2-5.) No separate consideration is given to those undeveloped arguments. These creditors also take issue with the fund set aside for the Duffs' claim reverting to Debtor upon the Duff's rejection of the Plan. (*Id.*) No citation supports this additional argument, either. But the suggestion that the reversion is unfair is contradicted by the plain language of the Code: Section 1141(b) revests all property in a debtor upon confirmation *except* to the extent explicitly provided in a plan or a confirmation order. *E.g.*, *In re Gen. Media, Inc.*, 335 B.R. 66, 74 (Bankr. S.D.N.Y. 2005) ("[U]nless the plan says something different, confirmation vests the property of the estate in the reorganized debtor. The estate comes to an end, and ceases to exist." (citation omitted)); *Prince v. Clare*, 67 B.R. 270, 272 (N.D. Ill. 1986) ("After the Plan was confirmed, the bankruptcy court no longer controlled disposition of such property; after confirmation, Prince's control of the revested property was the same as if no bankruptcy case had ever been filed, except to the extent that the Plan or order confirming the Plan provides otherwise."). These cases make plain that there is nothing groundbreaking or extraordinary about a Chapter 11 plan's reversion of a property interest to a debtor based upon the occurrence of certain conditions provided for in that plan. Moreover, other bankruptcy courts have sanctioned reversions exactly like the one at issue in this case. *See In re Goldblatt Bros., Inc.*, 132 B.R. 736, 737 & 739 (Bankr. N.D. Ill. 1991) (enforcing a plan provision which permitted a debtor to retain excess proceeds from a real estate transaction for use as working capital rather than devote those proceeds to paying down unsecured debts beyond the amount expressly allocated to those claims).

In addition to the fact that the decisions of the courts of Tennessee are not binding precedent for this Court, the district court was not the final word in *Green*.  On further appeal, the Sixth Circuit *rejected* the concept of artificial impairment. *See In re Vill. Green I, GP*, 811 F.3d 816, 818-19 (6th Cir. 2016).

*Green* was a single-asset case.  The debtor owned and operated a mortgaged apartment building, otherwise owing only trivial amounts to two small creditors. Finding that a sixty-day postponement of the debtor's obligations to its minor creditors (who were being paid in full) constituted impairment and that the small creditors' acceptance of the proposed plan therefore satisfied the § 1129(a)(10) confirmation requirement that at least one impaired class vote in favor of the reorganization, the bankruptcy court confirmed the debtor's plan over the mortgagee's objection.  The mortgagee thereafter appealed, arguing that the plan's impairment of the small claims was "contrived" because the debtor could have easily paid those claimants. *Id.* at 819. The Sixth Circuit disagreed with the mortgagee's notion of impairment, holding that any putative artificiality of the impairment was "immaterial." *Id.*  In other words, impairment is impairment: "Section 1124(1) by its terms asks only whether a plan would alter a claimant's interests, not whether the debtor had bad motives in seeking to alter them." *Id.*

Being inconsistent with the precedent of this Circuit, the Duffs' artificial-impairment argument must be rejected as a matter of law.  But their argument would have failed on the merits even if *Green* had recognized the validity of that doctrine in certain circumstances.

The situation before this Court is not like the one in *Green*. Debtor is a professional service corporation whose hundreds of medical providers practice thirty medical specialties having more than 700,000 patient interactions across southwestern Kentucky every year. (Tuesday Tr. 34:5-35:2.) Numerous stakeholders will be impacted by this bankruptcy case. In addition to hundreds of scheduled claims (Dkt. Nos. 53-54, 173), the records of the Bankruptcy Clerk reflect that proofs of claims totaling $231,110,695.16 have been asserted by 57 claimants. This starkly contrasts the situation in *Green*, where the debtor only owed money to his mortgagee and two unsecured claimants who were so closely allied with the debtor that they refused the mortgagee's offer to pay their claims up front and in full rather than receive deferred payments under the proposed plan. *Green*, 811 F.3d at 819. No such allegiances have been shown to have been at work in this reorganization, and at least nine claimants in this case have transferred their claims to unaffiliated third parties. (*E.g.*, Dkt. Nos. 298-31, 320, 324-26, & 443.) These facts render inapplicable a key ground for the Sixth Circuit's conclusion that the *Green* debtor had proposed its plan in bad faith. *Id*.

Instead, the facts of this case demonstrate that Debtor has sought to restructure its debts in good faith through arm's-length negotiations with its creditors. In an effort to treat its unsecured trade creditors in a fair and equitable manner, Debtor has proposed a plan which carefully rations its available dollars ahead of the *de minimis annual* net income of $130,000.00—a net operating margin of 0.0597%—that Debtor projects for the twelve months following the Effective Date after meeting its obligations arising in the ordinary course and under the Plan. (Debtor's Ex. 9 at p. 69.) Significantly, a material reason that

20

Debtor's budget is so constricted is because, as discussed in relation to § 1129(a)(7) *infra*, Debtor is paying its tort claimants more than the Code requires in these circumstances. Stretching itself in this way for the benefit of unsecured creditors can only be interpreted as a indicium of Debtor's good faith, not bad.

For these reasons, it is clear that Debtor's financial circumstances starkly contrasts those presented in the *Green* case, where the debtor had projected a *monthly* net operating income thirty times greater than the small-potatoes claims. *Green*, 811 F.3d at 819. It was this fact together with the ostensible cooperation between the debtor and its *de minimis* claimants that gave rise to the conclusion that the debtor had acted in bad faith. *Id.* Neither factor is present in this case. For these reasons and in consideration of the evidence presented at the December Trial, the Court finds both that Debtor has engaged in a legitimate rationing of its dollars[11] and that its Plan was proposed in good faith as required by § 1129(a)(3).

3.     **SECTION 1129(A)(7)—BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS.**

Section 1129(a)(7) states that a court can confirm a plan only if:

With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
    (i) has accepted the plan; or
    (ii) will receive or retain under the plan on account of such claim or
interest property of a value, as of the effective date of the plan, that is not less

---

[11] Even the jurisdictions which recognize the artificial impairment doctrine acknowledge the validity of countervailing business considerations. *E.g.*, *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 691 (D. Mass. 2000) ("A class is artificially impaired if a debtor intentionally alters the class members' rights in order to manipulate the voting process, but it is legitimately impaired if the creditors' rights are altered for a proper business purpose.").

than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

In order to confirm Debtor's Plan, the Court must find that it provides each nonconsenting, impaired class of claimants at least as much as those claimants would receive if this case were converted to Chapter 7 on the Effective Date and Debtor's assets were thereafter liquidated. *E.g.*, *In re Schoeneberg*, 156 B.R. 963, 969 (Bankr. W.D. Tex. 1993). The Duffs attempt to argue that Debtor's liquidation analysis is "flawed," ostensibly on the basis that Debtor has undervalued its assets and overinflated its liabilities. (*See* Duff Objection at pp. 9-10.) Neither authority nor any reasoned and specific objection to Debtor's analyses accompany these bald assertions. The same may be said of other objectors. In the Tweedy Objection, for example, it asserts no specific objections need be raised under § 1129(a)(7) in order to deny confirmation because the underlying questions are "already before the Court. . . ." (*See* Tweedy Objection ¶ J.) Other creditors argued that the Plan's designation of Debtor's secured creditors as unimpaired is an admission that there is a surplus estate for purposes of § 1129(a)(7). (*See* Cole Objection at pp. 5-6; Jenkins Objection at pp. 5-6; and Coldwell Objection at pp. 5-6.) A debtor's designations of creditors' classes as being impaired or unimpaired, however, pertains to treatment under a confirmed plan, not how they would fare in a liquidating proceeding of that same debtor in the event its reorganization effort fails.

The proper method of determining whether or not Debtor's Plan provides objecting creditors these protections is to conduct a hypothetical liquidation that follows the rules of distribution imposed by § 726 (*In re Kentucky Lumber Co.*, 860 F.2d 674, 678

(6th Cir. 1988)), taking into account the probable costs incident to such a liquidation.  *In re Jonick Deli Corp.*, 263 B.R. 196, 199-200 (S.D.N.Y. 2001) (determining that the U.S. Trustee's quarterly fees stand on equal footing with the panel trustee's fees in the converted case); *In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000) (estimating the hypothetical Chapter 7 trustee's fees under § 326(a) based on the approximate size of the estate).  For the reasons explained below, applying the rules of distribution imposed by § 726 shows that Debtor's Plan satisfies the best-interests test.

### Breach of an Assumed Agreement Gives Rise to an Administrative Claim

Pursuant to the Court's authorization, Debtor has assumed its employment contracts with all of its physicians. (Dkt. No. 238.)  When Debtor did so, it assumed each "contract *cum onere*," meaning that (1) Debtor must fully perform its obligations under the contracts, or (2) Debtor's "liabilities" to the physicians must be treated as administrative expenses, "which are afforded the highest priority on the debtor's estate, 11 U.S.C. § 503(b)(1)(A)." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984).  This protection arises automatically and without further order of the Court because § 365(g)(2) elevates the damages incident to a bankruptcy estate's breach of an assumed executory contract to the category of administrative expenses as a matter of law. *E.g.*, *In re Jartran, Inc.*, 71 B.R. 938, 943 (Bankr. N.D. Ill. 1987).  Because the Supreme Court has directly decided that the damages incident to a breach of an assumed contract are properly categorized as administrative expenses pursuant to § 365(g) and that statutory provision has not been amended in any way which would alter the analysis, there is no room to rule differently in this case. *E.g.*, *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456, 135 S. Ct.

2401, 2409, 192 L. Ed. 2d 463 (2015) (determining that "*stare decisis* carries enhanced force when a decision . . . interprets a statute.").

### *Debtor's Physicians would be Entitled to Liquidated Damages in a Liquidation*

Categorizing damages is only the first step in the analysis; they next must be calculated. According to § 365(g), "the rejection of an executory contract . . . constitutes a breach of such contract." The Supreme Court clarified in *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, that "under Section 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy." 139 S. Ct. 1652, 1666 (2019). As relevant to this hypothetical liquidation, the assumed employment agreements provide for liquidated damages in the event of a separation: Unless a physician is fired for misconduct, the assumed agreements (1) retain the physicians for an indefinite term and (2) entitle any physician who is terminated to be paid 5.4 months' salary[12] as liquidated damages for breach of contract (with such salary amortized from the amount reflected in the terminated physician's most-recent W-2). In exchange, each physician has agreed not to compete with Debtor for at least three years following a departure from Debtor.[13] Under the laws of Kentucky, liquidated damages provisions are "particularly

---

[12] Debtor employs two types of physicians. Associate physicians comprise 20% of all physicians and shareholder physicians comprise the remaining 80%. (Tuesday Tr. 34:18-22 & 161:4-17.) The former is entitled to three-months' liquidated damages and the latter six. (*Compare* Debtor's Ex. 11 at pp. 1-2 *with* Debtor's Ex. 12 at pp. 1-2; *accord* Tuesday Tr. 158:21-23 & 159:25-160:5.) The weighted average, therefore, is 5.4-months' of liquidated damages.

[13] For the first time in their reply brief, the Duffs argued that the physicians would not be entitled to any liquidated damages because "at the end of the day, any termination liquidated damages would be more than offset by the liquidated damages the Estate would be entitled to for violation of the non-compete provisions in the same physician contracts." (Duffs' Reply Br. at pp. 11-12.) Neither reason nor authority supports this position. The countervailing restriction on the physicians' practice of medicine is extremely

24

appropriate" when, as here, they are exchanged in connection with noncompete covenants. *See Moore v. Pegasus Indus./Packaging, LLC*, Case No. 2022-CA-0648-MR, 2023 WL 3261461, at *2 (Ky. Ct. App. May 5, 2023). Because the Supreme Court requires that the measure of damages for breach of an executory contract be measured under applicable nonbankruptcy law and the laws of this Commonwealth respect the enforcement of liquidated damages in the context of noncompete agreements, the Court concludes that the physicians would be entitled to recover their liquidated damages as an administrative expense if Debtor breaches its agreements with those physicians.[14]

If this case were converted to a proceeding under Chapter 7, then the trustee would be forced to breach the physicians' assumed agreements almost immediately. A Chapter 7 trustee may seek authorization to operate a debtor's business under § 721 if such operation is in the interests of the estate. 11 U.S.C. § 721. But this authorization may only be conferred for a "limited period" in order to facilitate an "orderly liquidation of

---

narrow, extending only to their "home county" (*i.e.*, the county in which they work for Debtor). (Tuesday Tr. 222:23-223:4; *accord* Debtor's Ex. 12 at pp. 19-20.)

[14] Furthermore, as these are liquidated damages under an assumed contract, § 503(c) would not apply. *See In re Multech Corp.*, 47 B.R. 747, 751-52 (Bankr. N.D. Iowa 1985) ("Because an executory contract has been scrutinized by the Court prior to assumption, the liabilities and expenses resulting from a subsequent rejection are automatically granted administrative expense priority that will not be subject to further limitation by section 503."); *In re Foothills Texas, Inc.*, 408 B.R. 573, 585 (Bankr. D. Del. 2009) (the damages cap imposed by § 503(c) does not apply to assumed contracts; *see also In re Klein Sleep Prod., Inc.*, 78 F.3d 18, 23 (2d Cir. 1996) (describing *Multech* as the "seminal" analysis on these issues). The Sixth Circuit, while deciding *Multech* did not apply in Chapter 13 cases, made clear that *Multech* is a valid rule in Chapter 11 cases. *See In re Parmenter*, 527 F.3d 606, 610 (6th Cir. 2008). Regardless of the application of *Multech*, the claim arising from each individual employment contract would not be a claim for § 503(c) severance, but a claim for liquidated damages because of Debtor's breach of the assumed contracts, which the Supreme Court recognized in *Bildisco*, *supra*, creates an administrative-expense claim to the full extent of the estate's "liabilities" thereunder.

the estate." *Id*. The trustee could not liquidate Debtor's assets (primarily the clinics in which it operates and the medical equipment it uses to treat patients) and retain the physicians at the same time. Even without that pressure, a bankruptcy trustee is not qualified to operate a complex, multisite healthcare business and would accordingly have to dismiss the physicians almost immediately, thereby obligating the estate to treat the physicians' liquidated damages as administrative expenses.[15]

### Physicians' Damages Would Render the Converted Estate Administratively Insolvent

What is the consequence of the physicians' entitlement to have their liquidated damages paid as administrative expenses for purposes of Debtor's satisfaction of the best-interests test? No one but administrative claimants would be paid from Debtor's liquidated estate if this case were converted to one under Chapter 7.

In Chapter 7 liquidations, the Supreme Court has made clear that the priority scheme of § 726 "is an absolute command." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464, 137 S. Ct. 973, 983, 197 L. Ed. 2d 398 (2017). The Court *must* adhere to this priority scheme in conducting its hypothetical liquidation analysis. *In re Kentucky Lumber Co.*, 860 F.2d 674, 678 (6th Cir. 1988). As relevant to the circumstances of this case, § 726 requires

---

[15] The Duffs' argument that the trustee could avoid a breach by assigning the doctors' contracts to some unspecified entity does not get around this problem. (Duffs' Reply Br. at pp. 9-10.) Section 365(c)(1) of the Code prohibits a trustee from assigning an executory contract if, as here, "applicable law excuses a party . . . to such contract . . . [from] rendering performance to an entity other than the debtor or the debtor in possession." The doctors' contracts contain anti-assignment clauses, (*e.g.*, Debtor's Ex. 12 at pp. 20-21), and "Kentucky law has long held that anti-assignment clauses in contracts are enforceable." *Am. Gen. Life Ins. Co. v. DRB Cap., LLC*, 562 S.W.3d 916, 920 (Ky. 2018). Furthermore, most of the physicians' contracts are premised on the fact that they are shareholders of Debtor. There is no way for the trustee to graft those equity interests onto some other entity by means of an assignment.

that the estate's proceeds be distributed first to the Chapter 7 trustee (and U.S. Trustee), and then to the administrative-expense claims arising in the Chapter 11 proceeding. *See* 11 U.S.C. § 726(b).  Only then would any money flow to unsecured creditors, such as the Duffs. 11 U.S.C. §§ 507(a)(2), 726(a)(1) & (a)(2).  In order to determine whether a liquidation would result in any proceeds to pay unsecured creditors anything in the hypothetical Chapter 7 case, the Court must approximate the fees that would be owed to the trustee and damages that would be owed to the physicians, and then determine what proceeds would result from the estate's liquidation.

With respect to these issues and as discussed *supra*, the Court will rely upon the credible testimony and reports of Debtor's experts.  The Court otherwise accepts the reasonable (and uncontested) estimates of Debtor's miscellaneous assets put forth in Debtor's liquidation analysis it submitted in support of its disclosure statement. (Debtor's Ex. 9 at pp. 71-80; Tuesday Tr. 138:25-139:9.)  That analysis, corroborated by the expert testimony of Messrs. Miller, Wilensky, and Daigrepont, demonstrates the estate's net proceeds would be only $3,961,620.56 after accounting for the as-appraised liquidation value of Debtor's assets and after deducting secured claims. (*Id*. at p. 76.)  However, that estimate was derived using an estimated cost of $2,000,000.00 for handling Debtor's patients' records, (*id*.), which the Court concluded *supra* would actually cost at least $3,130,706.00 based on the expert testimony of Mr. Daigrepont.  This adjustment, and the inclusion of the Chestnut Road property's value as discussed *supra*, brings the net liquidation value of the estate to $2,893,414.56.

27

Standing alone,[16] the physicians' liquidated damages dwarf this sum: Debtor's estimated compensation for its physicians in 2023 is $55,847,377.00. (Debtor's Ex. 14 at p. 4; Tuesday Tr. 156:17-157:17.) And so, the physicians' liquidated damages would be $25,131,319.87 (*i.e.*, $55,847,377.00 * 5.4 months / 12 months).[17]  Even assuming that the trustee could operate Debtor's business temporarily under § 721 for a portion of this period, the doctors' damages would still run into the millions and well beyond the estate's net liquidation value.

In sum, because asset liquidations in Chapter 7 result in proceeds significantly less than the assets' fair market value and because there are significant secured claims in this case, the liquidated estate could not even pay the immediately ascertainable administrative expenses in full, let alone any unsecured creditor.  Accordingly, the Court concludes that Debtor's Plan meets the best-interests-of-creditors test under § 1129(a)(7), because any payment to Debtor's unsecured claimants suffices in these circumstances, *In re Breitburn Energy Partners LP*, 582 B.R. 321 (Bankr. S.D.N.Y. 2018) (proposed Chapter 11 plan satisfied "best interests of creditors" test because unsecured creditors would receive

---

[16] Significantly, these damages do not stand alone, because the Chapter 7 estate would also incur significant liquidation costs and other administrative expenses.  For example, Debtor's employees are paid biweekly. (Tuesday Tr. 177:10-20.)  Based on the timing of its payments (*i.e.*, two weeks of accrual and one week of post-accrual processing), Debtor estimated that about $7,743,530.94 in unpaid wages and $311,184.63 in unpaid payroll taxes would be due on the Effective Date based on its 2022 certified financials. (Debtor's Ex. 9 at p. 79.)  These figures represent approximately three weeks of wages and payroll taxes. (*Id.*)  Both of these expenses would be entitled to priority treatment under § 503(b)(1)(A)(i), which deems "wages, salaries, and commissions for services rendered after the commencement of the case" to be administrative expenses.

[17] Although quite significant in the aggregate, Debtor's physicians are actually earning significantly less than their similarly situated peers. (Tuesday Tr. 37:9-40:9.)

nothing if the estate were liquidated under Chapter 7), and because Debtor's Plan nonetheless provided for payments into the millions for its unsecured creditors. *E.g.*, Plan §§ 3.2(E) (providing for payments totaling $1,146,797.99 to Trade Vendors) & 3.2(L) ($1,800,000.00 to unliquidated tort claimants).[18]  Indeed, the total payments to Trade Vendors and Class 4-B creditors ($2,946,797.99) actually exceeds the liquidation value of the estate ($2,893,414.56) without even accounting for the second-priority Chapter 11 administrative expenses under § 726(b). The Court further finds that any difference in the present value of these figures is more than offset by the millions in administrative claims for post-petition wages and liquidated damages that would arise in the converted case.

4.    SECTION 1129(A)(11) — FEASIBILITY OF THE PLAN.

Section 1129(a)(11) states that a court can confirm a plan only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."   "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting *Colliers* treatise).  Thus, "the feasibility standard is whether the plan offers a reasonable assurance of success.   Success need not be guaranteed." *Kane v.*

---

[18] As the Duffs rejected the Plan, they have been moved from Class 4-C to Class 4-B and the sum allocated to Class 4-C will revert to the Debtor as discussed *supra*.

*Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).  In other words, the Code "does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (quoting *Colliers* treatise).   Relevant to determining whether or not a plan clears that "low threshold" are the following considerations:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re U.S. Truck Co., Inc.*, 800 F.2d 581, 589 (6th Cir. 1986).

Although it is impossible to predict with certainty the precise future profitability of Debtor's business, the Graves-Gilbert Clinic has existed and served the citizens of Southcentral Kentucky for decades.  Once the Plan is confirmed, Debtor will again be able to resume its ordinary forms of financing by pledging its assets to various lenders. (*E.g.*, Tuesday Tr. 57:20-58:6.)   Debtor's revenues run into the nine figures, and Debtor's audited financial statements from the previous five years show that Debtor's topline revenue has grown an average of 6.61% each year during that time. (*See* Debtor's Ex. 15 at p. 11; Debtor's Ex. 16 at p. 10; Debtor's Ex. 17 at p. 10; Debtor's Ex. 18 at p. 11; and Debtor's Ex. 19 at p. 11.)  Further, Debtor's income is driven by the healthcare needs of the communities it serves and, therefore, is much more immune to macroeconomic changes than businesses in other industries.  Debtor has proposed that its existing management continue to oversee Debtor's operations, and has thoroughly justified that

proposal pursuant to § 1129(a)(5).  Together, these facts show that confirmation is not likely to be followed by the need for further financial reorganization of Debtor.[19]

In sum, there is every reason to believe that Debtor's operations will be successful. There is nothing "visionary" about the continuation of this decades-old healthcare business.  Upon the Effective Date, Debtor will have sufficient cash flow and capital resources to pay its expenses as they become due and otherwise to satisfy its capital needs for the conduct of its business—just as it did prior to the Duffs' verdict and the assertion of other similar tort claims.  The Court is not persuaded by creditors' arguments that Debtor's current cash crunch renders the Plan infeasible.  (*E.g.*, Wednesday Tr. 213:7-214:1.)  Both Mr. Vowels and Mr. Sinclair testified that Debtor intends to defer more than five million dollars in employee retirement contributions—which are not due until

---

[19] The Duffs argue that the Court should deny confirmation of Debtor's Plan because the projections submitted in connection with its Disclosure Statement fail to account for Debtor's obligations under the Plan. (Duff Objection at p. 12.)  Not so.  Debtor's forecasts explicitly include a monthly line-item identified as "Chapter 11 Creditor Payments" for Debtor's obligations arising under the Plan. (*See* Debtor's Projections at pp. 2-3, which are filed as Ex. C to Debtor's First Amended Disclosure Statement, Dkt. No. 339.)  Further, the payments to trade creditors are subsumed in the line items for payment of such expenses generally. (*See* Tuesday Tr. 178:7-19.)  Moreover, the post-confirmation transactions which may reorganize Debtor into three entities that are contemplated by § 8.2(b) of the Plan are beside the point. (*Cf.* Duff Objection at pp. 12-13.)  Contrary to the Duffs' suggestion, the bankruptcy estate does not need to receive value on account of those future, hypothetical transactions (Duff Objection at pp. 12-13), especially when the Plan explicitly notes, to the extent that they survive Debtor's discharge, that the new subsidiary entities' rights in the collateral or cash flow they receive will be subject to the rights of creditors and Debtor's right to collect free cash flow from the receivables-subsidiary. (*See* Plan § 8.2(B).)  Debtor's owners are reacquiring their equity in the reorganized Debtor pursuant to the New Value Corollary, which is discussed *infra*.  But once a debtor's plan is confirmed, he again becomes "master of his own fate in the commercial world, free of the press of those creditors to whom he was indebted before he became a Chapter 11 supplicant." *Prince v. Clare*, 67 B.R. 270, 272 (N.D. Ill. 1986).  A debtor's prior owners who reacquire their equity under the New Value Corollary are likewise free to engage in whatever transactions concerning that reacquired equity they may wish to undertake.

October 2024 at any rate—in order to assuage the cash crunch. (*E.g.*, Tuesday Tr. 57:5-12, 58:7-12 & 191:25-192:3.)  Furthermore, Debtor is currently in negotiations with multiple banks about the possibility of refinancing its current loan portfolio with U.S. Bank, which will further assuage the cash crunch. (*E.g.*, Tuesday Tr. 103:20-104:11 & 228:5-8.) And it is prepared to take other commonsense measures, such as declining to pre-pay its malpractice insurance premiums in order to spread out that nearly four million dollar expense over the year rather than absorb it in full in January. (Tuesday Tr. 60:2-18.) For these reasons, the Court concludes that the Plan satisfies the requirements of § 1129(a)(11).

5.    **SECTION 1129(B)—REQUIREMENTS FOR CRAMDOWN PLANS.**

With Debtor's evidence having demonstrated its compliance with all applicable requirements of § 1129(a), the Court must also consider whether Debtor's Plan "unfairly discriminates" against any dissenting class and is "fair and equitable" with respect to such classes. 11 U.S.C. § 1129(b)(1). Each requirement is considered in turn.

### *Unfair Discrimination*

In order to cramdown a Chapter 11 plan, a plan proponent must show that the "plan does not discriminate unfairly . . . with respect to each class of claims or interest that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988) ("It is clear from this language that a plan need only be fair and equitable to classes that voted against the plan.").  The meaning of unfair discrimination is not defined in the Code, which has spurred the adoption of various standards for testing whether or not a plan unfairly discriminates.   "The

hallmarks of the various tests have been whether or not there is a reasonable basis for the discrimination, and whether or not the debtor can confirm and consummate a plan without the proposed discrimination." *In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) (quotation omitted); *accord* 7 COLLIER ON BANKRUPTCY ¶ 1129.03[3][a] ("The test thus boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization.").

As discussed above, Class 4-B and Class 4-C are dissenting classes. Unsecured trade debt in Class 3-A will receive a ninety-five percent dividend, while the dissenting tort creditors will receive a smaller dividend. *See* Plan §§ 3.2(E), 3.2(L), & 3.2(M). The question which must be resolved before cramming down Debtor's Plan is whether or not this different treatment is "unfair." *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997) (noting that "discrimination in the treatment of classes" is not proscribed unless the challenged discrimination is "unfair."). This question must be answered in light of the other confirmation requirements. *Colliers* provides the following explanation:

> Before reaching any issues of unfair discrimination, a court will have to have made affirmative findings on all other confirmation requirements. This means that, among other things, the court will have found that classification of the dissenting class is proper, and the dissenting class will receive at least its liquidation preference. All that is at issue is the "unfair" division of the reorganization surplus, that amount of value in excess of liquidation value.
>
> By including the "unfair discrimination" test, Congress made it clear that such a reorganization surplus did not have to be allocated to creditors on the basis of liquidation preferences. There can be "discrimination," so long as it is not "unfair."

> This makes some practical sense: unsecured creditors under nonbankruptcy law include such diverse entities as tort claimants, trade creditors, bondholders and possibly nontax governmental claims. On liquidation, all of these claimants share pro rata. To hold, however, that all such creditors should share proportionately in the reorganization surplus, when each group does not contribute proportionately to its creation and maintenance, makes little sense.

7 COLLIER ON BANKRUPTCY ¶ 1129.03[3].

Against this backdrop, the reported decisions finding unfair discrimination are not apposite to the factual situation before the Court. The cases which have found that a plan unfairly discriminated typically reached that conclusion because the facts of a case showed that the discrimination was designed purely to favor insiders, *e.g.*, *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (finding that a plan which fully paid unsecured debts guaranteed by the plan's proponent while paying other unsecured creditors a fifteen percent dividend unfairly discriminated), or was included in a plan for some improper purpose unrelated to a debtor's rehabilitation. *E.g.*, *In re ARN LTD. Ltd. P'ship*, 140 B.R. 5, 13-14 (Bankr. D.D.C. 1992) (landlord could not discriminate against its tenants on the basis that they had been a "nuisance" because such discrimination served no rehabilitative purpose where the landlord had the wherewithal to compensate the tenants in the same manner as other similarly-situated claimants).

Conversely, bankruptcy courts consistently find no unfairness in discrimination which serves to maintain the debtor's goodwill with important parties, such as trade creditors. *E.g.*, *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 584 (6th Cir. 1986) (approving the superior treatment accorded to the unsecured claim of a union, in part, because that preferred creditor had "a unique continued interest in the ongoing business of the

34

debtor.").[20]   Debtor's relationships with these trade creditors are absolutely essential to its ongoing operations, and there are a limited number of qualified trade vendors who might replace Debtor's current vendors in the area of Bowling Green, Kentucky. (Tuesday Tr. 162:19-163:22.)   This is a legitimate reason for treating these dissimilar claimants dissimilarly.

Furthermore, as *Colliers* discusses, it must be recalled that the issue of unfair discrimination concerns the division of the *reorganization* surplus.   When unsecured tort creditors possess claims against a legitimate, well-run enterprise such as Debtor, any limitation to their recovery against the estate only restricts recovery on their *excess* verdicts.   Debtor has and at all relevant times had significant liability coverage in place, creating a floor on tort creditors' recovery that runs into the millions. (*E.g.*, Dubrees' Ex. 5 at p. 2.)   These proceeds belong to the bankruptcy estate. *See In re Vitek, Inc.*, 51 F.3d 530, 535 (5th Cir. 1995).   And the Plan's reservation of these proceeds for the tort claimants,

---

[20] *See also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1057 & 1060-61 (3d Cir. 1987) (plan which paid a hospital's physicians' claims in full while paying other unsecured creditors with the same priority against the bankruptcy estate only thirty percent did not unfairly discriminate); *In re Aegerion Pharms., Inc.*, 605 B.R. 22, 34 (Bankr. S.D.N.Y. 2019) (gathering cases and concluding that courts "have rejected 'unfair discrimination' arguments in cases where trade creditors are treated better than other unsecured classes that have rejected a plan."); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 308 09 (Bankr. E.D.N.Y. 1992) (following U.S. Truck to conclude that better treatment of an unsecured claim of a union was justified because the debtor's "ability to continue to operate a union shop [wa]s absolutely critical to its ability to function successfully in its industry."); *In re Richard Buick, Inc.*, 126 B.R. 840, 851-52 (Bankr. E.D. Pa. 1991) (plan which paid trade creditors in full while paying other unsecured creditors a five percent dividend did not unfairly discriminate because the debtor's relationships with those trade creditors were important to a successful reorganization); *see also In re Rochem, Ltd.*, 58 B.R. 641, 643 44 (Bankr. D.N.J. 1985) (concluding that grouping unliquidated tort claims with the claims of trade creditors would have unfairly discriminated *against the preferred trade creditors*, not against the tort claimants); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 486 88 (Bankr. S.D. Ohio 1994) (discussing the important distinctions between trade creditors and other unsecured creditors in this context).

therefore, arguably *favors* them over the trade creditors, who have no recourse aside from their pro rata share of Debtor's reorganization surplus. *See In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 421 & n.8 (Bankr. E.D. Pa. 1995) (concluding that (1) "unsecured claims with access to insurance" are significantly different than and may be treated differently than general unsecured claims, and (2) providing insured unsecured claimants with the proceeds o that insurance and a pro rata share of the estate's reorganization surplus cannot be unfair because "[d]iscrimination in favor of [an insured unsecured claimant] may not serve as a basis for its claim of unfair discrimination."). Simply put, the Plan did not unfairly discriminate against Debtor's dissenting tort claimants by first reserving the estate's insurance proceeds for them and then sweetening the pot with another three million dollars. *See* Plan §§ 3.2(L) ($1,800,000.00 to unliquidated tort claimants), 3.2(M) ($1,200,000.00 to judgment creditors holding tort claims), and § 12.2(B) (preserving the tort creditors' rights to receive applicable insurance proceeds by excluding such claims from the Plan's general releases of the bankruptcy estate's co-obligors).

For these reasons, the Court concludes that the preference accorded Debtor's trade creditors with respect to the reorganization surplus is not "unfair" under § 1129(b)(1).

### *Fair and Equitable—Absolute Priority Rule*

After showing that a plan is not unfairly discriminatory, a plan proponent also must show that the "the plan . . . is fair and equitable . . . with respect to each class of claims or interest that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Unlike the concept of unfair discrimination, the phrase "fair and equitable"

36

is partly defined in the statute: Section 1129(b)(2) offers illustrative means by which debtors may satisfy the fair-and-equitable standard (which is more commonly known as the Absolute Priority Rule). But the specific requirements of the Absolute Priority Rule vary depending upon whether cramdown is sought against classes of interest holders, secured claims, or, as here, unsecured claims.

When a class of unsecured creditors opposes confirmation, the Absolute Priority Rule generally requires such creditors are "provided for in full before any junior class can receive or retain any property under a reorganization plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (alteration omitted). But the Absolute Priority Rule is not always "absolute": The prohibition only applies to the retention of property by the equity holders *on account of their equity interests*. *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii). That is why a debtor's stockholders may retain their equity in the debtor if they provide "new value" to the estate. Under *U.S. Truck*, a debtor's equity holders provide "new value" when they contribute capital to the reorganized debtor which is (1) essential, (2) substantial, and (3) the contributed capital constitutes a "fair price" for the equity interest retained. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir. 1986). The requirements of *U.S. Truck* are satisfied here.[21]

---

[21] Other than in the Tweedy Objection, the arguments raised by creditors in their confirmation objections under § 1129(b)(1) completely fail to address the New Value Corollary. (*See* Cole Objection at pp. 6-7; Duff Objection at pp. 7-9; Jenkins Objection at pp. 6-7; and Coldwell Objection at pp. 6-7.) Despite their contention, Debtor's owners are not required to fully repay all creditors unconditionally in order to reacquire their equity. The Tweedy Objection acknowledges the applicability of the New Value Corollary in this Circuit in asserting that Debtor has failed to specifically identify what property is being paid by the owners under the New Value Corollary. (*See* Tweedy Objection ¶ F.) For the reasons stated below, that is incorrect. Nor was it persuasive for attorney Langdon to argue for the first time in open court that Debtor

Debtor's owners have made or propose to make three contributions of capital to Debtor's reorganization effort. *See Ahlers*, 485 U.S. at 203 (concluding that new value must be contributed in the form of money or money's worth in property rather than future contributions of labor and managerial expertise).[22]  First, pursuant to court order, the owners have made payments totaling $8,106,037.64 in satisfaction of the estate's critical vendor claims. (*See* Dkt. Nos. 5, 29, 107, 123, 196, 221, 257, 278; Plan § 3.2(G).)  Second, also pursuant to court order, the owners have made payments totaling $4,012,413.53 in

---

cannot satisfy the New Value Corollary because Debtor's Plan does not include a competitive bidding process for that equity. (Wednesday Tr. 223:7-17.) The New Value Corollary may be invoked in either of two circumstances: (1) a plan establishes the "fair value" that must be paid for the repurchased equity by means of a competitive bidding process for that equity, or (2) a plan proposes a fixed value for the repurchased equity after the exclusivity period under § 1121 has expired. *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999) (rejecting a plan which "vest[ed] equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan."). The limitation exists because "exclusivity" gives the appearance that "old equity might have obtained the interest for less than someone else might have paid." *See In re PWS Holding Corp.*, 228 F.3d 224, 239 (3d Cir. 2000). Debtor's Plan meets this threshold criterion because the exclusivity period, as extended by court order, (*see* Dkt. Nos. 268, 341), expired on September 29, 2023. *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000) (explaining that satisfaction of the *LaSalle* rule "can be achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity (or the right to designate who will own the equity) in the context of the Debtors' Plan.").

[22] Although the Tweedys argued in court that *Ahlers* does question whether or not a company can ever truly be worthless, *compare* Wednesday Tr. 212:19-213:6 *with Ahlers*, 485 U.S. at 207-09, the facts of this case do not test *Ahlers'* limits in this regard.  To start with, it must be clarified that what the Supreme Court specifically rejected was the respondents' argument that the Absolute Priority Rule does not even apply when a company is valueless. *Ahlers*, 485 U.S. at 207-08. Such a rule would only serve to invite abuse, because a company with no immediate going-concern value may have excellent future or contingent prospects. *Id*. Under the facts of this case, as discussed *supra*, there was consensus among both Debtor's and the Duffs' valuation experts that Debtor's equity has a net negative value.  If Debtor had relied upon this fact in order to pay creditors literally nothing, then the limits of *Ahlers* would be implicated and tested. But that it not what the Plan proposes.  Instead, as discussed herein, Debtor's owners are making millions of dollars in payments toward the Plan in an effort to treat creditors fairly and equitably. Conversely, the owners in *Ahlers* only proposed to contribute so-called sweat equity, without assuming responsibility for any of the estate's obligations or giving up any of their own rights against the estate. *See id*. at 204-06.

satisfaction of the estate's pre-petition employment-related claims.[23] (*See* Dkt. Nos. 3, 22; Plan § 3.2(F).)  Third, and not including the money that would be paid to tort creditors, the owners propose in the Plan to make additional payments totaling $1,146,797.99 to Debtor's unsecured trade vendors. *See* Plan §§ 3.2(E).

It is appropriate to attribute these payments to Debtor's owners, whose compensation is derived from Debtor's revenue minus its expenses. (*E.g.*, Tuesday Tr. 37:12-19 & 149:16-19.)  This is true because the owners are assuming responsibility for estate liabilities by causing some of their compensation to be diverted from themselves to Debtor's pre-petition creditors in furtherance of Debtor's rehabilitation.  If they had not agreed to any one of these voluntary reductions, then their compensation would have been increased by the corresponding amount.  Significantly, the compensation that they physicians are surrendering comes from their W-2 wages as employees, not their *de minimis* year-end distributions as shareholders.[24] (Tuesday Tr. 41:9-42:16.)  For these reasons, voluntarily relinquishing a significant portion of their wages (*i.e.*, their rights against the estate) in order to satisfy dischargeable claims against the estate is an

---

[23] These payments were separate and apart from the ordinary-course and cure-related payments to Debtor's providers pursuant to the Court's authorization to assume its employment agreements with those providers.

[24] Creditors argued in open court that new-value payments always must come directly from a debtor's owners irrespective of a case's facts and circumstances. (*E.g.*, Tuesday Tr. 14:9-16-:17.) This argument elides the complicated relationship between Debtor and its physicians, who interface with Debtor both as owners and as W-2 employees. "Courts have long endorsed the principle of substance over form in the bankruptcy context." *In re Mirant Corp.*, No. 03-46590 DML, 2005 WL 6443618, at *6 (Bankr. N.D. Tex. Nov. 22, 2005) (gathering cases) (quotation omitted).  Requiring the physicians to contribute new value with post-tax dollars in the manner demanded by these creditors would not improve creditors' recovery.  Therefore, the Court will not elevate form over substance in order to penalize the owners by requiring them to devote their post-tax dollars to the Plan, which would be a significant penalty. (*See* Wednesday Tr. 216:10-13.)

appropriate way for prior equity holders to deliver new value. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 439 (Bankr. S.D. Tex. 2009); *In re A&F Elec. Co., Inc.*, Case No. 07-01377, 2007 WL 5582063, at *6-*7, *11 & n.7 (Bankr. M.D. Tenn. Aug. 22, 2007) (owner-operator of a business making $37,680.00 in monthly net income contributed new value by contributing $100,000.00 to the estate and accepting a reduced salary during the plan's repayment period).

*Jevic* is also instructive on these questions. In that decision, and in contrast with *final* distributions in violation of the Code's priority schemes, the Supreme Court observed that bankruptcy courts regularly "approve[] interim distributions that violate ordinary priority rules." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 467 (2017). Such temporary distributions are done in service of "significant Code-related objectives that the priority-violating distributions serve," and may take the form of "'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims." *Id*. at 468 (citing cases). "In doing so, these courts have usually found that the distributions at issue would 'enable a successful reorganization and make even the disfavored creditors better off.'" *Id*. (quoting *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004)).

The reason that critical-vendor orders make *all* creditors better off lies in the requirement that "the favorable treatment of the critical vendor must not prejudice other unsecured creditors." *In re Corner Home Care, Inc.*, 438 B.R. 122, 127 (Bankr. W.D. Ky. 2010)

(applying the tripartite standard that has emerged among the bankruptcy courts after *Kmart*) (quotation omitted).  For it to be true that no creditors were prejudiced by a critical-vendor order, the payments to such critical vendors must be *in addition to* the payments that would otherwise have been required to be made to unsecured creditors.  That is precisely what occurred under the specific facts of this case: Debtor's owners surrendered approximately $12.25 million in salary that otherwise would have come to them and, having done so, they *still* must pay creditor's at least the liquidation value of the estate pursuant to § 1129(a)(7).  Significantly, as discussed *supra*, Debtor's owners are, in fact, paying *more* to unsecured creditors than that statute requires.

In sum, Debtor's owners have stridently endeavored to treat creditors fairly and equitably, they have moderated their own rights, assumed responsibility for dischargeable obligations of the estate, and in doing these things they have contributed enough money's worth in property for the Court to conclude that they are paying a "fair price" under *U.S. Truck*.  Indeed, based on the evidence presented at the December Trial, the Court further finds that the equity reacquired by Debtor's owners is far less valuable than the $12.25 million that Debtor's owners have already contributed to this reorganization without even considering the owners' additional obligations under the Plan.[25]

---

[25] The Duffs contend it is unfair for Debtor's owners to reacquire their equity without paying at least the balance-sheet values of Debtor's properties, which they argue totaled $13,335,932.00 as of September 30, 2023. (Duff Objection at pp. 8-9.)  But this is not a true measure of the fair value of Debtor's equity interest. (*E.g.*, Tuesday Tr. 162:5-10.)  As Mr. Brewster explained, a balance sheet's statement of stockholder equity derives from mechanical principles of accounting and is completely detached from the economic reality of an enterprise and its assets.  (*See* Wednesday Tr. 156:1-157:24).  Furthermore, even if book values were

Finally, there can be no question about the substantiality of the new value contributed by Debtor's owners. *See In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir. 1986) (approving a contribution of new value totaling less than one-month's profits for the debtor); *A&F Elec.*, 2007 WL 5582063, at *7 (approving a contribution totaling about three-months' profits when the owner-operator also accepted a voluntary pay cut).  Nor can the essentiality of these payments be questioned.  Without critical vendors, employees, and trade vendors, a business like Debtor's will fold.  That's why the Court approved both payments to critical vendors and payments on pre-petition debts to Debtor's employees. (Dkt. Nos. 3, 5, 22, and 29.)

For these reasons, the Court concludes that the Plan satisfies § 1129(b)(2)(B)(ii).

---

relevant to the analysis, Debtor's owners' contributions of New Value exceed the Duffs' figure by a substantial degree. Moreover, the other objecting creditors have admitted that Debtor's equity is worth no more than $12,000,000.00, based on certain tabulations they have done as of June 30, 2023. (*See* Cole Objection at pp. 6-7; Duff Objection at pp. 7-9; and Coldwell Objection at pp. 6-7.)  Again, Debtor's owners' have contributed New Value totaling $12.25 million without even taking into account the obligations imposed under the Plan.

6.    **PUTATIVE NON-DEBTOR RELEASES.**

Though raised most vociferously by the Dubrees, several tort claimants assert that Debtor's Plan is improper because it includes releases of non-debtor entities. (*See* Cole Objection at pp. 4-5; Dubree Objection at pp. 1-4; Tweedy Objection ¶¶ H-I; Jenkins Objection at pp. 4-5; and Coldwell Objection at pp. 4-5.)    Debtor explained in its Confirmation Memorandum that the Plan does not release third-parties over the objection of the dissenting creditors, and that it added comfort language at the request of certain creditors. (*See* Confirmation Memorandum at pp. 46-48.)    Debtor's counsel also represented that Debtor does not intend to release any physician over the objection of a dissenting creditor. (Tuesday Tr. 29:8-30:9.)    Although the Court agrees with Debtor's counsel that the language of the Plan is clear, *id.*, the simplest way to resolve this issue is for the Court to specify in this Confirmation Order that the physicians are not released.

## CONCLUSION

For the reasons set forth above, the Court concludes that Debtor and its Plan meet all requirements for confirmation.    In reaching this conclusion, the Court is mindful that both creditor and debtors have rights under the Bankruptcy Code.    However, it merits emphasis that the primary purpose of Chapter 11 is the rehabilitation of financially troubled businesses, *see NLRB v. Bildisco*, 465 U.S. 513, 527 (1983); *In re 312 W. 91st St. Co.*, 35 B.R. 346, 347 (Bankr. S.D.N.Y. 1983); *In re Langley*, 30 B.R. 595, 605 (Bankr. N.D. Ind. 1983), and the prevention of unnecessary liquidations, *see In re Piece Goods Shops Co.*, 188 B.R. 778, 790 (Bankr. M.D. N.C. 1995); *In re Chugiak Boat Works, Inc.*, 18 B.R. 292, 293 (Bankr. D. Alaska 1982). Under the unique circumstances of this case, where all

challengers to confirmation hold claims for the estate's *vicarious* liability and all such challengers have received greater protections than Chapter 11 affords them, Debtor's right to reorganize is particularly clear. The only reason that Debtor is liable for these debts is because of the liability employers incur for the acts of their employees, not because of its own wrongdoing. *See Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Vicarious liability. . . is not predicated upon a tortious act of the employer but upon the imputation to the employer of a tortious act of the employee. . . ."). Accordingly, the Court shall enter a separate order confirming the Plan in accordance with this opinion.